UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 17-mc-525 (JFB)

IN RE TWO SUBPOENAS TO TESTIFY BEFORE A GRAND JURY DATED DECEMBER 1, 2016, RETURNABLE DECEMBER 27, 2016

UNITED STATES OF AMERICA,

Movant,

VERSUS

JOHN DOE NOS. 1 AND 2,

Respondents.

**MEMORANDUM AND ORDER**
April 20, 2017

JOSEPH F. BIANCO, District Judge:

The United States of America (the "government") seeks an order compelling John Doe Nos. 1 and 2[1] (collectively, "respondents") to comply with two grand jury subpoenas dated December 1, 2016. Respondents oppose the government's motion on the grounds that production of the documents would violate the Fifth Amendment's act of production privilege. For the reasons set forth below, the Court holds that this privilege does not extend to documents in respondents' possession that are required to be kept under N.Y. Tax Law §§ 426 and 428.2, and, therefore, respondents must produce all records required to be kept under those provisions that have been maintained since November 1, 2015.

I. BACKGROUND

The government issued the two subpoenas in connection with their investigation of numerous cash liquor purchases allegedly made by respondents at the United States Navy Exchange at Mitchel Field in Garden City, New York (the "NEX"). (See Unsworn Decl. under Penalty of Perjury by Govt. Agent ("Govt. Decl."), ECF No. 7, at ¶ 10.) The NEX is a retail store owned and operated by the U.S. Navy by and through the Navy Exchange Service Command. (Id. ¶ 4.) It provides various goods and services, including alcohol, to active and retired military personnel as well as certain

---

[1] Because this case pertains to an ongoing grand jury investigation, the parties have been permitted to file documents under seal. Thus, this Memorandum and Order excludes identifying factual information.

designated civilians. (*Id.* ¶ 5.) Records obtained by the government indicate that John Doe No. 3 ("Seller"), a sales associate at the NEX, sold 121,479 bottles of alcohol valued at over $5.2 million between November 13, 2015 and October 12, 2016 to unauthorized purchasers, providing discounts on these sales in excess of $1.97 million. (*Id.* ¶ 7.)

The government initiated an investigation into these sales, and, in the course of this investigation, identified respondents as suspected unauthorized purchasers. (*Id.* ¶ 9.) The investigation revealed that John Doe No. 1 currently owns a retail liquor store ("Store No. 1"), previously owned a second retail liquor store until May 31, 2015 ("Store No. 2"), and also holds a New York State Liquor License. (*Id.*; *see also* Govt.'s Mem. Supp. Order to Show Cause and to Compel Compliance with Grand Jury Subpoenas *Duces Tecum*, ECF No. 1-1 ("Govt. Br."), Ex. A.) The investigation further showed that John Doe No. 2 is a civilian alcohol purchaser. (Govt. Decl. ¶ 9.)

The government's evidence indicates that Seller sold liquor to respondents at the NEX at discounted rates in exchange for cash bribes from respondents. (*Id.* ¶ 12.) Specifically, with respect to John Doe No. 1, government agents witnessed multiple liquor shipments transported from the NEX to Store No. 1, where they were unloaded and stocked for sale. (*Id.* ¶ 9 & n.1.) Occasionally, the shipments were taken to other locations, including residences and a parking garage across the street from Store No. 2. (*Id.*) Meanwhile, the government surveilled and videotaped John Doe No. 2 transporting liquor from the NEX. (*Id.*) The government has also obtained phone records that reveal numerous calls between both respondents and Seller, and a search of respondents' phones—seized pursuant to warrant—uncovered photographs of ledgers including various liquors, prices, and amounts. (*Id.* ¶¶ 15–17, 21; *see also id.*, Exs. B–C.) The numbers recorded in these ledgers establish that respondents frequently transported amounts in excess of ninety liters. (*See, e.g., id.*, Ex. B at 1 (record showing John Doe No. 1 purchased 50 "Remy," 15 "Blue," and 2 "Glenf." for $26,370); *id.*, Ex. C. at 2 (record showing John Doe No. 2 purchased 50 "Blue," 35 "Glenf.," 32 "Patron," and 10 "Macalan" for $75,781).[2]) Forensic analysis of John Doe No. 2's phone revealed that, after the government made initial contact with him, he manually deleted Seller's contact information. (*Id.* ¶ 22.)

On December 11, 2016, the government served federal grand jury subpoenas on respondents, granting them until February 21, 2017 to respond. (Govt. Br., Exs. A & B.) The subpoenas directed respondents to produce

1. Any and all documents, from November 1, 2015, to the present, concerning [Seller] and any of his agents or relatives.

2. Any and all documents concerning any payments, gifts, loans, or things of val-

---

[2] Text messages recovered by the government also indicate that, at one point, John Doe No. 2 requested amounts plainly exceeding ninety liters on several occasions. (*See, e.g.*, Govt. Aff. Supp. Three Applications Under Rule 41 for Warrants to Search and Seize ("Search Warrant Aff."), Case No. 16-MJ-1089 (Sealed), ¶ 68 (John Doe No. 2 sending Seller a text message requesting "20 more cases of Smirnoff" and Seller responding "I gave you everything I really had left"); *id.* ¶ 69 (John Doe No. 2 sending a text saying he "could easily push 40 [or] 50 cases").) (The Search Warrant Affidavit cited here has not been posted to ECF in this case because it has been sealed, but the government provided hard copies to both this Court and respondents' counsel. (*See* Govt. Decl. ¶ 15.))

ue, either given to or received from, [Seller, other individuals associated with him, and the two retail stores], or any of their agents or relatives.

3. Any and all documents, from November 1, 2015, to the present, concerning the United States Navy Exchange located at 16 Mitchel Field, Garden City, New York 11530.

4. Any and all documents concerning donations, bequests, payments, gifts, loans, or things of value given in the name of [Seller], or any of his agents or relatives.

5. Any and all documents concerning donations, bequests, payments, gifts, loans, or things of value given in the name of [Jane Roe[3]], or any of her agents or relatives.

(*Id.* Exs. A & B.)

Respondents refused to comply with the subpoenas, asserting their Fifth Amendment privilege against self-incrimination. (Resps.' Opp'n. to Order to Show Cause, ECF No. 5 ("Resp. Br."), Ex. A.) The government filed the instant motion to compel compliance with the grand jury subpoenas on February 24, 2017. (ECF No. 1.) Respondents filed a letter in opposition on March 10, 2017 (ECF No. 5), and the government replied on March 13, 2017 (ECF No. 7). This Court heard oral argument on the motion on March 30, 2017.

---

[3] Jane Roe appears to be connected to Seller, but the moving papers do not specify her precise connection.

(ECF No. 6.) The Court has fully considered the parties' submissions.

## II. DISCUSSION

The government now only seeks to compel production of documents required to be kept by state and federal law pursuant to the "required records" exception to the act of production privilege.[4] (*See* Govt. Reply Mem. Supp. of Order to Show Cause and to Compel Compliance with Grand Jury Subpoenas *Duces Tecum*, ECF No. 7 ("Govt. Reply"), at 1.) As set forth below, the Court concludes that respondents are required to keep various records under New York state law, and, therefore, must produce all such records kept since November 1, 2015 pursuant to the subpoenas and the relevant statutory provisions.

### A. Applicable Law

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege applies "when the accused is compelled to make a testimonial communication that is incriminating." *Fisher*, 425 U.S. at 408; *see also United States v. Hubbell*, 530 U.S. 27, 34 (2000) ("The word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character."). In *Fisher*, the Supreme Court recognized that the "act of producing evidence in response to a subpoena . . . has communicative aspects of

---

[4] In the alternative, the government seeks to compel production of documents to the extent permitted by the "foregone conclusion" exception to this privilege. *See Fisher v. United States*, 425 U.S. 391, 411 (1976). As discussed below, given the Court's conclusion that the required records exception applies, the Court need not and does not address the government's alternative argument.

its own, wholly aside from the contents of the papers produced." 425 U.S. at 410; *see also United States v. Doe*, 465 U.S. 605, 612 (1984) ("A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect."). Specifically, complying with a subpoena may "tacitly concede[] the existence of the papers demanded and their possession or control by" the subpoena recipient and the subpoena recipient's "belief that the papers are those described in the subpoena." *Fisher*, 425 U.S. at 410. The question is whether the "tacit averments" made in producing the responsive evidence are both "'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment." *Id.*; *see also In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999*, 191 F.3d 173, 178 (2d Cir. 1999) ("[I]t is now settled that an individual may claim an act of production privilege to decline to produce documents, the contents of which are not privileged, where the act of production is, itself, (1) compelled, (2) testimonial, and (3) incriminating.").

The Supreme Court, however, has recognized exceptions to this "act of production" privilege, including, as relevant here, the "required records" exception. *See Grosso v. United States*, 390 U.S. 62, 67–68 (1968). The Second Circuit has explained that, "[u]nder this exception, a person whose records are required to be kept by law has no Fifth Amendment protection against self-incrimination when these records are directed to be produced." *In re Doe*, 711 F.2d 1187, 1191 (2d Cir. 1983) (citing *Shapiro v. United States*, 335 U.S. 1, 17–18 & n.25 (1948)). In addition, "[t]his rule applies regardless of whether the records are kept pursuant to federal or state law." *Id.* As this Court has previously explained,

[t]he rationale underlying the required records exception is "twofold." First, participation in an activity that, by law or statute, mandates record-keeping may be deemed a waiver of the act of production privilege, "at least in cases in which there is a nexus between the government's production request and the purpose of the record-keeping requirement." Second, because such record-keeping is done pursuant to legal mandate (as opposed to an individual's voluntary choice), "the recordholder 'admits' little in the way of control or authentication by producing them."

*Grand Jury Subpoena Dated Feb. 2, 2012* ("*Grand Jury Subpoena I*"), 908 F. Supp. 2d 348, 353 (E.D.N.Y. 2012) (quoting *In re Two Grand Jury Subpoenae Duces Tecum*, 793 F.2d 69, 73 (2d Cir. 1986)), *aff'd*, *In re Grand Jury Subpoena Dated Feb. 2, 2012* ("*Grand Jury Subpoena II*"), 741 F.3d 339 (2d Cir. 2013).

The test for determining whether documents constitute required records under this exception (the "*Grosso* test") imposes three requirements: "(1) the requirement that they be kept must be essentially regulatory, (2) the records must be of a kind which the regulated party has customarily kept, and (3) the records themselves must have assumed 'public aspects' which render them analogous to public documents." *Doe*, 711 F.2d at 1191 (citing *Grosso*, 390 U.S. at 67–68); *see also Grand Jury Subpoena II*, 741 F.3d at 346–47 ("[T]his Court still recognizes the required records exception."); *Rajah v. Mukasey*, 544 F.3d 427, 442 (2d Cir. 2008) ("[T]he Fifth Amendment's act of

4

production privilege does not cover records that are required to be kept pursuant to a civil regulatory regime.").

B. Application

As a threshold matter, the government cites four provisions of state and federal law as requiring respondents to maintain records in connection with the sale and transport of alcohol, namely, N.Y. Tax Law §§ 426 and 428.1, 26 U.S.C. § 5121, and 27 C.F.R. §§ 31.151, 31.154, and 31.155. (Govt. Br. at 7.) The Court concludes that, at the very least, respondents are subject to recordkeeping requirements under New York state law. First, under N.Y. Tax Law § 426 ("Section 426"), "[e]very brand owner, distributor, *owner or other person* shall keep a complete and accurate record of all purchases and sales or other dispositions of alcoholic beverages. . . ." (emphasis added). This section further provides that "[n]othing in this section contained shall be construed to require the keeping of a record of the purchase or disposition of alcoholic beverages by a consumer thereof, *except by a person who uses the same for commercial purposes*, or of the sale of alcoholic beverages at retail." *Id.* (emphasis added). The word "owner" is defined within the statutory scheme to "include any person selling or offering alcoholic beverages for sale at retail." N.Y. Tax Law § 420(9).[5]

The government's evidence shows (and, for purposes of this motion, respondents do not dispute) that John Doe No. 1 currently owns at least one retail liquor store. (Govt. Decl. ¶ 9.) Therefore, he plainly qualifies as an "owner" within the meaning of the statute. *See* N.Y. Tax Law § 420(9). Accordingly, he is required to maintain records of all transactions, except transactions with consumers at retail, under Section 426. *See* N.Y. Tax Law § 426. This clearly includes transactions with suppliers such as Seller.

John Doe No. 2, meanwhile, qualifies as an "other person" subject to the recordkeeping requirements of Section 426 because the number of purchases he made and the amounts of money he spent clearly indicate that he bought the alcoholic beverages "for commercial purposes." *Id.* He, therefore, does not fall under Section 426's exception for consumers who purchase alcohol at retail and, correspondingly, is required to maintain records of his transactions with Seller. *See id.* (excluding "the purchase or disposition of alcoholic beverages by a consumer thereof, *except by a person who uses the same for commercial purposes*" from recordkeeping requirements) (emphasis added).

In addition, the Court concludes that respondents are also subject to the recordkeeping requirements of N.Y. Tax Law § 428.2 ("Section 428.2"). Under this provision, anyone who transports

> more than ninety liters of liquors . . . must have in his or her possession a manifest, invoice or other document which shows the name and address of the person from whom such liquors were received and the date and place of receipt of such liquor and the name and address of every person to whom such operator is to make delivery of

---

[5] The statute's express inclusion of the terms "owner" and "other person," combined with the statutory definition of "owner" and the indication that consumers who purchase alcohol at retail for commercial purposes must also keep records, plainly defeats respondents' argument that Section 426 only applies to wholesalers, despite its additional recordkeeping requirements for those who produce and distribute alcohol. *See* N.Y. Tax Law §§ 420(9), 426.

the same and the place of delivery, together with the number of liters to be delivered to each person, and, if such liquor is being imported into the state in such motor vehicle or such other means of transport, the name of the distributor importing or causing such liquors to be imported into the state and such other information as the commissioner may require pursuant to rule or regulation.

N.Y. Tax Law § 428.2.[6] Furthermore, under a regulation enacted pursuant to this provision, "[t]he manifest document required pursuant to this section, and any records needed to verify the entries and accuracy of the manifest document, must be retained for a period of three years." N.Y. Comp. Codes R. & Regs. tit. 20 ("N.Y.C.C.R.R."), § 68.4(h). That regulation also more precisely specifies the information required to be reported in the manifest (the "Section 428.2 information"):

> (i) the transporter's name, address, Federal employer identification number and State Liquor Authority number;
>
> (ii) the type of transportation equipment (*e.g.,* car, truck, etc.) and the vehicle identification number of such equipment;
>
> (iii) the name and address of every person from whom the liquors were received, and where applicable, the State Liquor Authority number of each such person;
>
> (iv) the date and, if different from subparagraph (iii), the place(s) of receipt of such liquors;
>
> (v) the quantity of liquors received (in liters);
>
> (vi) the name and address of every person to whom the liquors will be delivered, and where applicable, the State Liquor Authority number of each such person;
>
> (vii) the date, approximate time and, if different from subparagraph (vi), the place(s) of delivery of the liquors;
>
> (viii) the quantity of liquors delivered to each person (in liters); and

---

[6] The Court concludes that N.Y. Tax Law § 428.1 ("Section 428.1") does not apply. Under that provision,

> [e]very person transporting alcoholic beverages within this state, whether such transportation originates within or without this state, *when required by the commissioner*, shall keep a true and accurate record of all alcoholic beverages so transported, showing such facts with relation to such alcoholic beverages and their transportation *as the commissioner may require.*

N.Y. Tax Law § 428.1 (emphasis added). By its plain terms, Section 428.1 only applies when the commissioner promulgates regulations pursuant to it. It does not appear, however, that any regulations have been so promulgated. Therefore, Section 428.1 does not apply to respondents.

6

(ix) where the liquors are being imported into New York State, the name and address of the registered distributor importing or causing the liquors to be imported into the State, and that distributor's Department of Taxation and Finance registration number and State Liquor Authority number.

*Id.* § 68.4(b)(1).

Here, based on the evidence uncovered in the investigation, respondents plainly qualify as transporters under Section 428.2 because the government's evidence indicates (and, for purposes of this motion, respondents do not dispute) that they both transported quantities of alcoholic beverages in excess of ninety liters on multiple occasions. (*See* Govt. Decl. ¶ 9 & n.1; *see also id.* ¶ 7; *id.*, Exs. B–C.) As such, they were required to keep "a manifest, invoice or other document" with the above identified information, N.Y. Tax Law § 428.2, as well as "any records needed to verify the entries and accuracy of the manifest document" for three years, N.Y.C.C.R.R. § 68.4(h). In other words, respondents were obliged to keep records of the Section 428.2 information for a period of three years.[7]

---

[7] The information required to be recorded under Section 428.2 largely overlaps with the information required to be kept under the federal statutes and regulations cited by the government. *See* 26 U.S.C. § 5121 (requiring "[e]very wholesaler in liquors" to keep "a record of distilled spirits received and disposed of by him"); 27 C.F.R. § 31.151 (requiring wholesalers to keep "records of physical receipt and disposition of distilled spirits"); 27 C.F.R. § 31.155 (requiring wholesalers to "maintain a daily record of the physical receipt of each individual lot or shipment of distilled spirits"). Therefore, the Court need not determine the applicability of these provisions to respondents and, consequently, whether respondents qualify as "wholesalers" under them.

Having concluded that respondents are required to maintain records of the Section 428.2 information as well as records "of all purchases and sales or other dispositions of alcoholic beverages" under Section 426, the Court now turns to whether these records qualify as "required records" under the exception.

1. "Essentially Regulatory"

The Second Circuit has explained that the "essentially regulatory" prong of the *Grosso* test "precludes Congress from circumventing the Fifth Amendment privilege by enacting comprehensive legislation 'directed at a selective group inherently suspect of criminal activities.'" *Grand Jury Subpoena II*, 741 F.3d at 347 (quoting *Marchetti v. United States*, 390 U.S. 39, 57 (1968)). Thus, where the statutory scheme "is not 'directed at the public at large' and concerns 'an area permeated with criminal statutes,' courts are more likely to hold that the required records exception does not apply." *Id.* (quoting *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965)). In short, this first prong asks "whether the specific section in question is 'essentially regulatory' or directed at 'an area permeated with criminal statutes.'" *Id.* at 348 (quoting *California v. Byers*, 402 U.S. 424, 430 (1971)). For instance, courts have held that the exception applies "in the context of drivers involved in automobile accidents, custodians of state-supervised children, and even various sections of the [Bank Secrecy Act ("BSA")]." *Id.* By contrast, it does not

---

In addition, to the extent the government relies on 27 C.F.R. § 31.154, that reliance is misplaced because nothing in the government's submissions suggests that respondents are "brewers" or "proprietors of distilled spirits plants, bonded wine cellars, bonded wine warehouses, [or] taxpaid wine bottling houses." 27 C.F.R. § 31.154.

7

apply where the scheme involves illegal gambling, marijuana sales, and the ownership of dangerous firearms. *Id.*

*Grand Jury Subpoena II* provides a more specific example. In that case, the Second Circuit held that a provision of the BSA was "essentially regulatory" because that provision "target[ed] those engaged in the lawful activity of owning a foreign bank account." *Id.* at 348. In particular, the Court highlighted the fact that ownership of such an account was "not 'inherently suspect,'" thus removing it from the realm of cases where the exception does not apply. *Id.*; *see also Grand Jury Subpoena I* (this Court noting, in the underlying decision affirmed by the Second Circuit, that "the provision at issue here applies to hundreds of thousands of foreign bank accounts" and that "[t]here is nothing inherently illegal about having or being a beneficiary of an offshore foreign banking account" (citations omitted)). Furthermore, the Court held that the statute's "mixed criminal and civil purposes" did not alter this conclusion, given that the statute targeted a group engaged in lawful activities. *Grand Jury Subpoena II*, 741 F.3d at 349 ("We agree with our sister circuits: the fact that a statute relates both to criminal law and to civil regulatory matters does not strip the statute of its status as 'essentially regulatory.'" (brackets and citations omitted)).

Here, like the statutory scheme in *Grand Jury Subpoena II*, New York's regime for taxing alcoholic beverages targets "those engaged in [a] lawful activity," that is not "'directed at a selective group inherently suspect of criminal activities.'" *Id.* at 347 (quoting *Marchetti*, 390 U.S. at 57.) Specifically, the purchase and commercial transportation of alcohol is plainly a "lawful activity," and, consequently, those who engage in it are not "inherently suspect of criminal activities."[8] *Id.* Indeed, the Second Circuit has applied the required records exception to a parallel federal scheme, namely the "statutory scheme for taxation of distilled spirits, set out at 26 U.S.C. §§ 5001–5692 (1964)," characterizing that scheme as "a genuine revenue raising program . . . not directed at 'a select few,' but to thousands of legitimate producers, distributors, and retailers." *United States v. Fricano*, 416 F.2d 434, 435 (2d Cir. 1969) (quoting *Leary v. United States*, 395 U.S. 6, 18 (1969)). Like that scheme, New York's scheme is "not directed at 'a select few,' but to thousands of legitimate producers, distributors, and retailers," which, as noted above, are engaged in a lawful enterprise. *Id.* Accordingly, this Court concludes that the recordkeeping requirements of Sections 426 and 428.2 are "essentially regulatory" in nature.

Respondents argue that the state law regime is not "essentially regulatory" because it contains criminal penalties for those who violate it. *See, e.g.*, N.Y. Tax Law § 1813 ("Any person required to be registered as a distributor . . . who, while not so registered, knowingly imports or causes to be imported into the state, for sale or use therein, any liquors . . . shall be guilty of a class A misdemeanor."). As the Second Circuit has made clear, however, "the fact that a statute relates both to criminal law and to civil regulatory matters does not strip the statute of its status as 'essentially regulatory.'" *Grand Jury Subpoena II*, 741 F.3d at 349. Indeed, the statute at issue in *Grand Jury Subpoena II* also contained criminal sanctions for certain violations, *see, e.g.*, 31 U.S.C. § 5322, but that did not transform it

---

[8] Nothing in the state statutory scheme suggests that the scheme is designed to target those suspected of furnishing alcohol to minors. Instead, the scheme is designed to facilitate the taxation of alcoholic beverages.

into a criminal scheme. Thus, the fact that New York's scheme for taxing alcohol beverages includes criminal sanctions does change its "essentially regulatory" character. *See also Fricano*, 416 F.2d at 435 ("[C]riminal penalties may be imposed incident to valid regulatory statutes and that records can be required to be kept when reasonably necessary to the administration of such a statute."). As such, the first prong of the required records test is satisfied.

2. "Customarily Kept"

Under the second prong of the *Grosso* test, "the regulated 'information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept.'" *Grand Jury Subpoena II*, 741 F.3d at 349 (quoting *Grosso*, 390 U.S. at 68). In other words, "the records [must be] typically kept in connection with the regulated activity." *Grand Jury Subpoena I*, 908 F. Supp. 2d at 356. In *Grand Jury Subpoena II*, for example, the Second Circuit held that records of the bank's name, the maximum amount held in each account each year, and the account number were "customarily kept" by people with foreign bank accounts because "[c]ommon sense dictate[d] that beneficiaries keep these records 'in part because they need the information to access their foreign bank accounts.'" 741 F.3d at 349.

Respondents do not explicitly contest this requirement, and the Court concludes that it is plainly met. As in *Grand Jury Subpoena II*, common sense here dictates that transporters and commercial purchasers of large quantities of alcoholic beverages keep records of the type required by Sections 426 and 428.2 for business reasons, such as tracking inventory and maintaining proof of revenue. Indeed, the government has provided photographic evidence establishing that, in the course of purchasing and transporting alcoholic beverages, respondents regularly kept detailed documentation of, *inter alia*, the quantities and prices of the purchased beverages, thus confirming that the types of records required to be maintained by the New York scheme are "customarily kept" in this line of business. (*See* Govt. Decl. ¶ 9 & n.1; *id.*, Exs. B–C (a collection of photos of records obtained from respondents' phones).)

3. "Public Aspects"

The third prong of the *Grosso* test "asks whether the required records 'have assumed public aspects which render them at least analogous to public documents.'" *Grand Jury Subpoena II*, 741 F.3d at 351 (quoting *In re Grand Jury Proceedings, No. 4-10*, 707 F.3d 1262, 1273 (11th Cir. 2013)). Records assume a public aspect under this prong when they are "required to be created under an *otherwise valid* regulatory regime." *Id.* In other words, "[t]he record need not be 'public' in that anyone can examine or copy it at any time; it need only be lawfully required to be kept." *Id.* Thus, the Court in *Grand Jury Subpoena II* held that the relevant records satisfied the third prong of the *Grosso* test because "[t]he BSA [was] an otherwise-valid regulatory scheme that lawfully requires beneficiaries of foreign bank accounts to retain records containing the basic information about their accounts." *Id.*

Here, respondents do not argue, and there is no basis for the Court to conclude, that the statutory regime at issue is "constitutionally infirm." *Id.* ("A constitutionally infirm statute cannot recharacterize private information as public. However, information that a statute lawfully requires a person to record is legally distinct from information that no statute lawfully requires anyone to record.") Consequently, given

9

that Sections 426 and 428.2 are part of a "valid regulatory regime," *id.*, the records assume a public aspect and, therefore, the third *Grosso* prong is satisfied.

\* \* \*

For these reasons, the Court concludes that the three prongs of the *Grosso* test are satisfied. Respondents argue, however, that *Grosso* imposes a fourth requirement that must be satisfied for the required records exception to apply. Specifically, they contend that there must be a nexus between the purpose of the statutory scheme and the government investigation that seeks production of documents pursuant to that scheme. This argument stems from language that the Second Circuit has utilized in describing the rationale behind the required records exception:

> First, if a person conducts an activity in which record-keeping is required by statute or rule, he may be deemed to have waived his privilege with respect to the act of production—*at least in cases in which there is a nexus between the government's production request and the purpose of the record-keeping requirement*. Second, because the records must be kept by law, the record-holder 'admits' little in the way of control or authentication by producing them.

*Grand Jury Subpoena II*, 741 F.3d at 346 (quoting *Two Grand Jury Subpoenae*, 793 F.2d at 73) (emphasis added); *see also Grand Jury Subpoena I*, 908 F. Supp. 2d at 353 (quoting same language). This language, however, does not impose an additional "nexus" requirement on the required records exception, and no federal court has ever imposed such a requirement based on this language. *See, e.g., Grand Jury Subpoena II*, 741 F.3d at 346; *Two Grand Jury Subpoenae*, 793 F.2d at 73.

In addition, although a nexus between the statutory scheme and the production request may provide evidence that the person subject to the scheme waived any privilege, the Second Circuit's use of the phrase "at least" suggests that this waiver argument may also apply when there is no such nexus. In any event, respondents' argument overlooks the other justification for the required records exception—that production of records required to be kept by law adds "little in the way of control or authentication." *Grand Jury Subpoena II*, 741 F.3d at 346 (quoting *Two Grand Jury Subpoenae*, 793 F.2d at 73). Indeed, this may be the more significant justification for the exception, as the Supreme Court has recognized in another context that the act of production privilege does not apply where production "adds little or nothing to the sum total of the Government's information." *Fisher*, 425 U.S. at 411 (explaining the rationale behind the foregone conclusion exception to the act of production privilege). As such, a "nexus" requirement does not follow from the rationale underlying the exception.

III. CONCLUSION

In sum, the Court concludes that respondents are subject to the recordkeeping requirements of Sections 426 and 428.2. Because these records fall under the required records exception to the act of production privilege, respondents must produce any such records kept since November 1, 2015 in compliance with the subpoenas issued by the government. In particular, respondents must produce any records kept in their possession since November 1, 2015 "of all

purchases and sales or other dispositions of alcoholic beverages" pursuant to Section 426, as well as any records required to be kept under Section 428.2 and N.Y.C.C.R.R. § 68.4, including records that document

(i) the transporter's name, address, Federal employer identification number and State Liquor Authority number;

(ii) the type of transportation equipment (*e.g.*, car, truck, etc.) and the vehicle identification number of such equipment;

(iii) the name and address of every person from whom the liquors were received, and where applicable, the State Liquor Authority number of each such person;

(iv) the date and, if different from subparagraph (iii), the place(s) of receipt of such liquors;

(v) the quantity of liquors received (in liters);

(vi) the name and address of every person to whom the liquors will be delivered, and where applicable, the State Liquor Authority number of each such person;

(vii) the date, approximate time and, if different from subparagraph (vi), the place(s) of delivery of the liquors;

(viii) the quantity of liquors delivered to each person (in liters); and

(ix) where the liquors are being imported into New York State, the name and address of the registered distributor importing or causing the liquors to be imported into the State, and that distributor's Department of Taxation and Finance registration number and State Liquor Authority number.

N.Y.C.C.R.R. § 68.4(b)(1); *see also id.* § 68.4(h) (requiring transporters to maintain "any records needed to verify the entries and accuracy of the manifest document" for three years).

SO ORDERED.

_____
Joseph F. Bianco
United States District Judge

Date:   April 20, 2017
        Central Islip, NY

\* \* \*

The government is represented by Luke V. Cass of the U.S. Department of Justice, Public Integrity Section, 1400 New York Avenue, NW, 12th Floor, Washington, D.C. 20530. John Doe No. 1 is represented by Peter J. Tomao, 600 Old County Road, Suite 328, Garden City, New York 11530. John Doe No. 2 is represented by Alan M. Nelson, 3000 Marcus Avenue, Lake Success, New York 11042.